## Case No. 14,836.

### UNITED STATES v. COLLINS.

[2 Curt. 194.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1854.

SEAMEN—INDICTMENT FOR FLOGGING—CRUEL AND UNUSUAL PUNISHMENT.

Flogging is not "a cruel and unusual punishment," within the meaning of the third section of the act of March 3, 1835 (4 Stat. 776). The defendant should have been indicted for beating and wounding the seaman.

[Cited in Riley v. Allen, 23 Fed. 48; U. S. v. Trice, 30 Fed. 492.]

This was an indictment against [Walter Collins] the master of a vessel of the United States, under the act of March 3, 1835 (4 Stat. 776), for inflicting on one of the crew a cruel and unusual punishment. The case opened by the district attorney was that the defendant had inflicted the punishment of flogging, abolished by the act of September, 1850 (9 Stat. 515).

Dist. Atty. Brown, for the United States.
Mr. Potter, contra.

---

## Case No. 14,837.

### UNITED STATES v. COLLINS.

### RICH v. CAMPBELL.

### UNITED STATES v. GARDNER.

[1 Woods, 499; 18 Int. Rev. Rec. 69; 5 Chi. Leg. News, 525; 5 Leg. Op. 93.] [1]

Circuit Court, S. D. Georgia. April Term, 1873.

JURY — SELECTION OF GRAND JURY — FOLLOWING STATE PRACTICE—SELECTION BY COMMISSIONERS —INCRIMINATING TESTIMONY—OFFICERS.

1. The act of congress of July 20, 1840 (5 Stat., 394), prescribing how jurors in courts of the United States shall be designated, does not require a minute adherence to the state practice on that subject by the United States courts.
[Cited in Brewer v. Jacobs, 22 Fed. 234; U. S. v. Richardson, 28 Fed. 69.]

2. It is not necessary, under said act, for the United States courts to employ state officers to perform for them any part of the duty of designating jurors. They may and should impose that duty entirely on their own officers.

3. The law of Georgia required that the names of jurors should be taken from the book of the receiver of tax returns; held, that this requirement was not binding on the courts of the United States. Those courts were only required to take care that their jurors had the same qualifications as jurors in the state courts.

4. A rule of the United States court for the Southern district of Georgia, which prescribed that the names of five hundred persons, having the qualifications of jurors under the state law, should be selected from the body of the district by the marshal and clerk and three United States commissioners, to be designated by the court, and that the names of grand and petit jurors should be drawn from such list by the marshal and clerk, by lot, is in substantial accord with the law of Georgia prescribing how jurors shall be selected, and is a compliance with the act of congress on the subject.

5. Where a charge of misconduct is made against an officer, whether amounting to an indictable offense, or only to his discredit as such officer, which might furnish grounds for his removal or impeachment, he is not bound to be a witness against himself.

6. An inquisitorial examination, under oath, of a party charged with an offense or misconduct, would infringe the spirit if not the letter of the fifth amendment to the constitution of the Unit-

ed States, and would be repugnant to the principles of personal liberty embodied in the common law.

[Cited in U. S. v. Hammond, Case No. 15,-294.]

7. One of the officers appointed to select the names of five hundred persons from whom jurors were to be drawn, applied to a reputable citizen of a distant county for the names of proper persons residing in his vicinity to be placed upon the list. The names furnished, in compliance with this request, were submitted to the board of officers whose duty it was to make out the list of five hundred names, and some of the names so furnished were put upon the list: *Held*, that this was a substantial compliance with the rule which required the selection of the names to be made by the board of officers.

8. A public officer cannot, by subsequent declarations, invalidate his own official act.

A motion was made in this case to quash the indictment, on the ground that the order of the court under which the grand and petit juries were selected and drawn, was illegal, not being in conformity with the requirements of the act of congress on that subject. The act of congress governing the subject is that of July 20, 1840 (5 Stat. 394), and provides as follows, namely: "That jurors to serve in courts of the United States, in each state respectively, shall have the like qualifications, and be entitled to the like exemptions, as jurors of the highest court of law of such state now have and are entitled to, and shall hereafter from time to time have and be entitled to, and shall be designated by ballot, lot or otherwise, according to the mode of forming such juries now practiced and hereafter to be practiced therein, in so far as such mode may be practicable by the courts of the United States, or the officers thereof; and for this purpose the said courts shall have power to make all necessary rules and regulations for conforming the designation and impaneling of juries in substance to the laws and usages now in force in such state; and further, shall have power, by rule, or order, from time to time, to conform the same to any change in these respects which may hereafter be adopted by the legislatures of the respective states for the state courts." On the 7th of December, 1872, the circuit court of the United States for the Southern district of Georgia (Judges WOODS and ERSKINE holding the court), revised its rules respecting the mode of selecting and impaneling grand and petit jurors; and, in pursuance of these rules, on the 10th of January, 1873, the officers appointed by the court to that duty made out and returned the jury list, from which the grand jury was drawn that found the indictment in this case. The defendant moved to quash, on the ground that the mode of designating and impaneling jurors prescribed by the revised rules does not correspond to that used in the state courts, and that the qualifications of jurors are not the same as the state laws prescribe. For the defendant, it was contended that the act of congress required strict conformity to the state laws in these respects.

R. F. Lyon and Julian Hartridge, for the motion.

H. P. Farrow, U. S. Atty., and A. T. Akerman, contra.

Before BRADLEY, Circuit Justice, and WOODS, Circuit Judge.

BRADLEY, Circuit Justice. A motion is made to quash the indictment in this case on the ground that the grand jury, by which it was found, was illegally selected and impaneled. The process and procedure of the courts of the United States are, of course, subject to the sole regulation of congress and of those courts. They are entirely independent of state laws and usages, except so far as these may be adopted, or followed as a matter of convenience. There is no fundamental principle which requires a conformity thereto. Undoubtedly the convenience of the legal profession, and the habits of the people will be best consulted by a general conformity as far as circumstances will admit. That is all. On the subject of selecting and impaneling jurors in the United States courts, congress at its first session, in the twenty-ninth section of the judiciary act, directed that they should be designated by lot, or otherwise, in each state, according to the mode therein practiced at that time, so far as practicable: and that they should have the same qualifications as required for jurors in the highest courts of the state; and should be returned from such parts of the district as the court should direct. This rule was subsequently modified and, in 1840, it was so framed as to adapt it to the changes which might, from time to time, be made by state legislation. By the act of July 20th, of that year, which is the law now in force (5 Stat. 394), it was provided "that jurors to serve in the courts of the United States in each state respectively, shall have the like qualifications, and be entitled to the like exemptions as jurors of the highest court of law of such state now have and are entitled to, and shall hereafter from time to time have and be entitled, and shall be designated by ballot, lot, or otherwise, according to the mode of forming such juries, now practiced and hereafter to be practiced therein, in so far as such mode may be practicable by the courts of the United States, or the officers thereof; and for this purpose the courts shall have power to make all necessary rules and regulations for conforming the designation and impaneling of juries, in substance, to the laws and usages now in force in such state," with power to make such changes in these respects as the legislature of the state may adopt.

It is pertinent to observe that congress does not adopt the respective state laws, but only requires conformity to them in certain respects, and then gives the courts power to make rules for the attainment of such conformity, in substance as far as practicable, in their different circumstances. The question now to decide is, whether the rules which

have been adopted by this court on the subject, conform to the requirements of the act of congress. There is nothing in the act that requires a slavish or minute adherence to the details of the state practice; and nothing which hints at the incongruous notion that the courts of the United States in the designation and impaneling of jurors are to employ any officers or agencies except their own, and those under their control. The great object is to obtain jurors of like qualifications, and to designate and impanel them in substantially the same way as in the state courts. And, of course, this is to be effected by the courts of the United States themselves and their officers, and not by the agency of state courts or their officers; for the act, in speaking of the mode to be followed, expressly says, "in so far as such mode may be practicable by the courts of the United States, or the officers thereof." It would be an inconvenient mixture of jurisdictions, and might seriously embarrass the proceedings of the courts, if they had to depend on the action of state officials, over whom they have no supervision or control. This disposes in limine of the objection that the jury list was not taken, and that the rule does not require them to be taken from the lists made by the state authorities. As state officials make up the jury lists for the state courts, even strict parallelism of practice requires that the United States officials should make them up for the United States courts. The harmony of the state and federal jurisdictions requires that each should act freely and independently of each other.

The question then recurs, whether the rules adopted by this court in reference to jurors accords with the act of congress, in adopting the state practice, so far as the courts of the United States and the officers thereof, independent of the aid of the state courts and officers, can practicably conform to such practice in the respects required by the act. Conformity is required by the act in two respects: First, in reference to the qualifications and exemptions of jurors; secondly, in reference to the mode of designating and impaneling jurors, as by ballot, lot or otherwise, which mode is to be conformed, in substance, to that pursued in the highest court of the state. It will be observed that the act does not require the court to make any rules with regard to the qualification of jurors, but only with regard to the mode of selecting them. Qualifications have respect to the juror personally, and may relate to his age, his property, citizenship, or anything else belonging to his personal character or standing. In the state of Georgia the only qualifications of jurors, expressly required by the constitution and laws, are that they shall be upright and intelligent jurors between the ages of 21 and 60. There is an implied qualification that they shall be tax payers, and therefore citizens, as the statute of February 15, 1869, requires that they shall be selected for the state courts in each county from the book of the receiver of tax returns. Of course, the placing of a man's name on the receiver's book is not a qualification; for it is the act of another man. It implies a qualification, however, namely, that of being a tax payer, or a person liable to pay taxes and to have his name placed on said book. Now all these qualifications are required in jurors by the rule of this court. The officers appointed for the purpose are to select from the body of the district five hundred upright and intelligent persons, citizens of the district (and of course tax payers), between the ages of 21 and 60 years, without regard to race, color, or previous condition, to serve as jurors. As before remarked, it was not necessary that the rule should have specified these qualifications. Jurors not having them could be objected to by a challenge to the polls without any rule of court on the subject. But the rule has specified them, and in doing so has adopted the qualifications which the state laws require. On this point the objection to the rules cannot be sustained.

The next question is, whether the rules of this court have in substance adopted the mode of designating and impaneling jurors, which is prescribed by the state laws, as by ballot, lot, or otherwise. The act of congress requires that they shall "be designated by ballot, lot, or otherwise, according to the mode of forming such juries," practiced in the highest court of law of the state, "in so far as such mode may be practicable by the courts of the United States, or the officers thereof, and for this purpose" (that is, for the purpose of securing the designation of jurors by ballot, lot, or otherwise, according to the mode practiced in the state courts), the courts of the United States "shall have power to make all necessary rules and regulations for conforming the designation and impaneling of juries, in substance, to the laws and usages" of the state. From this language of the act it is obvious that all that is required is, that the mode of designating and impaneling be substantially the same; not that the officers to carry it into effect shall be the same either in rank or in number; nor that the same kind of jury boxes, or material of which the boxes are composed, whether wood or iron, shall be the same; nor that they shall be kept and guarded in the same manner; nor that the same number of names shall be placed in the box; nor that in any other matter of detail, a minute imitation of the state practice is to be observed. In these matters the courts of the United States may exercise their discretion as to the best mode of securing the main object of the law, which is, to secure the service of properly qualified juries, selected and impaneled substantially according to the mode pursued in the state courts. Now, what is the mode pursued in these courts? The constitution of the state (article 5, § 13, par. 2) simply declares that "the general assembly shall provide by law

for the selection of upright and intelligent persons to serve as jurors." and that "there shall be no distinction between the classes of persons who compose grand and petit jurors." Not every person, not every citizen, is to be placed on the jury list. A selection is to be made; and the object of that selection is to procure those who are upright and intelligent. Who is to make this selection is left to the legislature to prescribe. Now, can it be possible that state or county officials may be vested with this power of selection, and that United States officials must be denied this power? Can it be the meaning of the act of congress that the courts of the United States must only take jurors whom the state officials may have selected? The considerations before referred to respecting the necessary independence of these courts upon the action of state officers and state courts, seem to afford a complete answer to these questions. On looking at the act of assembly before referred to, passed to carry the constitutional clause into effect, we find that it provides substantially as follows: That the ordinary of each county, together with the clerk of the superior court and three commissioners appointed by the presiding judge of the superior court (and removable at pleasure) shall meet at the court house on the first Monday in June, biennially, and select from the book of the receiver of tax returns, upright and intelligent persons to serve as jurors, and make out tickets with the names of the persons so selected, and put them in a box having two apartments, to be locked and sealed by the judge and placed in the care of the clerk, and the key in the care of the sheriff; and no grand or petit juror shall be drawn but in the presence of the judge in open court, and no person shall open the box, or alter the names placed therein. It further provides that at the close of each term, the judges of the superior court, in open court, shall unlock the box and break the seal, and cause to be drawn from apartment No. 1 not less than 18, nor more than 23 names, to serve as grand jurors at the next term; and then 36 names to serve as petit jurors—which names are to be deposited in apartment No. 2 until all are drawn from No. 1, and so on alternately. Directions are then given for issuing a precept to the sheriff to summon the jurors so drawn. Provision is also made for summoning talesmen in case of necessity.

Now with these regulations let us compare the rules adopted by this court. They are as follows: "Order of Court Amending Jury Rules.—The court shall appoint three of the United States commissioners residing in the Southern district of Georgia, and the said commissioners with the marshal for the district of Georgia, and the clerk of the court shall, within thirty days after the adjournment of this court, select from the body of the Southern district of Georgia, five hundred upright and intelligent persons, citizens of said district, between the ages of 21 and 60 years, without regard to race, color, or previous condition, to serve as jurors. And the clerk of the district and circuit courts for said district, and marshall, shall place the names of the persons so selected in a box, from which they shall draw within ten days after said names are so deposited, not less than forty-five nor more than fifty names, unless otherwise ordered by a judge, to serve as jurors in the circuit court, and not less than forty-five nor more than fifty names, unless otherwise ordered by the judge, to serve as jurors in the district court. And the first twenty-three names so drawn for each court shall be the grand jurors for such court, unless the court or a judge shall otherwise order. And within thirty days after each succeeding term of said courts respectively, unless previously drawn by the court, it shall be the duty of the marshal and clerk to draw from said box in the manner before stated, the same number of jurors to serve at the next succeeding term of said courts respectively, unless the number is changed by order of the judge. And if from any cause they are unable to procure from the body of the district, as before required, the names of the requisite number of qualified jurors, then in that event, the names of those they have been able to obtain shall constitute the list from which said jurors shall be taken, and the names of those so drawn shall be placed in another compartment of said box, there to remain until all the names shall have been drawn from the first compartment. The said box shall be kept locked, except when opened for the purpose of drawing or revising the list, and the clerk shall keep the box and the marshal the key. If from failure to draw, as hereinbefore directed, or from any other cause, there shall be a deficiency in whole or in part of regular jurors, the court may order that upright and intelligent persons from the body of the district shall be forthwith summoned, as jurors or talesmen as the case may be. If the court should not sit at any term, the jurors drawn for that term shall stand over for the next term that shall be held. The marshal shall summon jurors by delivering to each personally, or by leaving it at his usual residence, a written or printed summons. The marshal, the clerk, and any one of said commissioners shall constitute a quorum for the purpose of carrying into effect this rule. And a deputy marshal may, in any case, whether in selecting or drawing jurors, or otherwise in the premises embraced in this rule, do whatever the marshal may himself do."

It seems to me very difficult to perceive any substantial difference between the mode of designating and impaneling jurors prescribed by these rules, and that prescribed by the state statute, after making due allowance for the different circumstances of the two juris-

dictions and the practicabilities of the case. In the first place a selection is to be made by officers designated for that purpose, in order to obtain upright and intelligent men. This selection is to be made from the body of citizens of the district, without regard to race, color, or previous condition. This is certainly in substantial conformity to the state law. It needs no argument to make it plainer than it is, by the mere statement of the fact. The qualification that the selection shall be made without regard to race, color, or previous condition, is in accord with the spirit of the fourteenth and fifteenth amendment to the constitution; by which all persons born or naturalized in the United States are citizens and entitled to full equality before the laws.

But it is objected that the marshal is substituted for the ordinary in the constitution of the board of commissioners, and that the ordinary is a judicial officer, whilst the marshal is not. There can be nothing in this objection. The conformity required is in substance only, and only as far as practicable for the courts of the United States and the officers thereof. The United States have no such officer as the ordinary. No officer could be more appropriately appointed than the marshal. But the comparison need not be minutely made between the officers. A board of responsible and suitable officers is constituted for the purpose of making the selection of jurors from the body of citizens. This is in substantial conformity to the state law. The disposition of the names when selected is the same. They are placed in a box on separate pieces of paper, and from that box the panels of grand and petit jurors are drawn from time to time as occasion requires, substantially in the same manner as in the state courts. due regard being had to the convenience of the court and the circumstances of the case. The objection that the drawing is to be made by the marshal and the clerk, within thirty days after each term, and not as in the state court, on the last day of term in open court, goes to a matter of practice and detail, and not to the substantial mode, of designating, or empaneling the juries, in the respects demanded by the act of congress. The mode adopted is the same. It is the drawing of the names by lot. The designation of the officers by whom it shall be done is left to the discretion and judgment of the court.

It seems to me, after a careful consideration of the objections which have been so ably urged, that the regulations adopted by this court are in substantial compliance with the act of congress. As it may be doubtful whether the question raised by this motion can be carried to the supreme court, and as the matter is one of great interest to this and other states, I shall avail myself on the first opportunity, of consulting the views of my associates on the supreme bench, and if any different result should be arrived at, this court will cheerfully modify its rules. As they now stand, whilst they seem to us entirely unobjectionable in point of law, they are in the most practicable and convenient form for the due administration of justice and the performance of the business of the courts.

The motion to quash the indictment for the cause now alleged is overruled.

In another case which came up after the foregoing decision was made—being the case of Rich v. Campbell—the panel of petit jurors was challenged on the ground taken in the previous case, and on the further ground that the officers appointed to designate and impanel the jurors for the United States courts had not complied with the rule, but had selected jurors from improper motives and for a special purpose. Evidence was taken on the challenge.

R. F. Lyon, for the challenge.

H. P. Farrow, U. S. Atty., A. T. Akerman, and A. W. Stone, contra.

Before BRADLEY, Circuit Justice, and WOODS, Circuit Judge.

BRADLEY, Circuit Justice. The array of jurors in this case is challenged by the defendant for several causes. One class of causes assigned consists of objections to the legality of the mode, adopted by this court by its general rule of the 7th of December last, of designating and impaneling jurors. This question has already been examined in the case of U. S. v. Collins [Case No. 14,837], and the objection was decided to be without foundation.

The other causes of challenge assigned are, that the jurors were not designated, selected and drawn in accordance with the rule, but that contrary thereto, they were designated with reference to their race, color and condition; and that they were selected, not by the persons appointed by the court for that purpose, but upon private information from irresponsible persons; and not from the body of citizens of the district, but from certain classes thereof, under private instructions from some of the persons appointed to make the selection as to the status, color and political bias of the persons whose names were to be furnished to make up the panel.

The challenge being traversed, evidence was adduced for the purpose of sustaining the charges made in the challenge. Amongst other witnesses the defendant called to the stand the marshal of the United States for this district, who is one of the officers appointed by the court to select and make up the list of jurors for the district, according to the rule made on the 7th of December last, and whose official conduct in that matter is impeached by the challenge. We refused to compel him to testify, for the following reasons: Where a charge of misconduct is made against an officer, whether amounting to an indictable offense, or only to his discredit as such officer, which might furnish grounds for his removal or impeachment, he is not bound to be a witness against himself. To compel him to be so

would infringe the spirit, if not the letter, of the fifth amendment to the constitution of the United States, which expressly declares that no person shall be compelled, in any criminal case, to be a witness against himself. An inquisitorial examination, under oath, of a party charged with an offense, is repugnant to the principles of personal liberty, which are embodied in every fibre of the common law. The French system of procedure, which allows the defendant to be examined as to his whole previous history, and as to the private motives by which he was governed in all the transactions of his life, is abhorrent to our feelings of justice and fair play. I should regret ever to see that system obtain a footing in this free country. If the party chooses to waive his right and submit to an examination, it may be admissible where public interests will not thereby be affected. But even then, the practice may, in certain cases, be against the public interest and contrary to public policy. If the party stand upon his rights, it raises an implication, however unjustifiable, that there is some good reason (unfavorable to him) for his refusal to be examined. Such an implication ought in no case to exist. The immunity is founded on principles of public policy and a regard to the just liberties of every citizen; and, when claimed, ought to be regarded and claimed as a fundamental right which cannot be properly assailed.

Applying these principles to this case, it is apparent that the conduct of the officers concerned in the designation and impaneling of jurors is seriously impeached by the challenge, and that to subject them to an examination under oath upon the matters charged would be, in effect, to compel them to testify on a criminal charge against themselves, and would, therefore, be a subversion, not only of their rights, but an invasion of the rights of all good citizens.

The other evidence offered by the defendant was in substance as follows: He proved by Elijah Bond, the postmaster at Macon, that at the request of the marshal he made out a list of names for jurors from the county of Bibb, which was partially adopted by the officers as a part of their list for the district; that he conferred with one or two other gentlemen on the subject, one of whom was the ordinary of the county; that he tried to get good men, and thought he did; that he received no instructions from the marshal as to the manner in which he should select, except a request to furnish the names of good and substantial citizens; that he endeavored to do so without regard to color; that he avoided those who had been engaged in the late election riots, it is true, and tried to select men who were not extreme men either way, but fair men; that he had lived in Macon since 1839, and was an officer in the Presbyterian church in that place; that Mr. Swayze, one of the commissioners appointed by the court to select jurors, and who resided in Macon, was absent at the time out of the state, and he had no conference with him on the subject. This was the substance of his testimony as far as it was material.

From this testimony the defendant's counsel argued, that the officers appointed by the court to select jurors did not make the selection themselves, but left it to others; and that this rendered the list illegal. But it was very pertinently answered by the counsel for the officers, that the giving of information was very different from official action. Four of the officers—the marshal, the clerk of the court, and two commissioners, Messrs. Wilson and Wade—on the 9th and 10th of January last, met in Savannah (the clerk, marshal and commissioner Wilson having held a preliminary meeting about a month previous) and proceeded to execute the powers conferred upon them by the court, and formed a list of five hundred names of persons selected from the body of citizens of the district, and certified and returned the same to the court, as directed by the rule. This they did officially, on their official responsibility; and in their return they certify that the names designated and returned by them, were the names of upright and intelligent persons, citizens of the district, between the ages of twenty-one and sixty, selected from the body of the district without regard to race, color or previous condition. This official certificate of these officers must be regarded by the court as conclusive evidence that they have properly performed their duty, unless the contrary be clearly proven. The only effect of Mr. Bond's evidence is, to show that they took proper means to get the requisite information as to the proper persons to select, by applying to the most competent and reliable persons for such information. It was conceded that a more upright and reliable man than Mr. Bond, the witness, could scarcely be found. What other means the officers may have employed to corroborate the information received from Mr. Bond does not appear. It could not be expected that the officers should be personally acquainted with the entire male population of the district, consisting of more than eighty counties. They were necessarily obliged, in many cases to rely on information derived from others. If they acted in good faith in getting the best information they could, and made their selection accordingly (and nothing appears to the contrary, but that they did this), their action cannot be impeached or held invalid. Impossibilities cannot be required of any officers. We see nothing in the evidence of Mr. Bond to impeach the jury list; but the contrary.

Some further evidence of a very unimportant character was adduced, which it is unnecessary to notice.

The defendant's counsel, however, produced and read an article published by Mr. Swayze, one of the commissioners appoint-

ed to select jurors, in a newspaper called the Macon Daily Enterprise, on the 7th inst., vindicating himself and the commission from attacks made against them in other newspapers. From this article the defendant's counsel asks us to gather by inference the conclusion that the jury commissioners had a purpose in making their selection of jurors, of selecting such persons as would carry out a certain result, namely: the indictment and conviction of certain persons charged with being concerned in the Macon riot last October; or more generally, the furtherance of government prosecutions in the district. Now we have examined this article, and can see no such fact implied in it. So far as it bears on the point under consideration, the whole pith of it is, that the jurors as before selected, being taken from the lists prepared by the county officials, ignored the enforcement act altogether, and refused to find a bill—no matter what the evidence—against a single person out of some forty, who had been bound over on the charge of participating in the election riot before mentioned, in which some persons were killed; and that the court made the new rule for the purpose of obtaining jurors, who would regard their oaths and recognize the law of the land; and that the jurors selected are men of that character. If this were proper evidence in the case at all, it would only go to show that jurors were sought who would act fairly and honestly, and in obedience to the laws; not that those were sought who would do any man's bidding, or who would aim at any result other than the truth and the right. This is a very different thing from packing a jury-box for the purpose of attaining a particular result in a particular case. But it is not evidence in the case at all. The declarations of Swayze, made after the list was selected and returned, are nothing but hearsay. They cannot affect the list in the least. The truth of this proposition is so obvious that it is unnecessary to discuss it. A person cannot by mere declarations made subsequently, invalidate his own deed or official act. Untold mischief would ensue if such a doctrine were established. Besides, it appears from the return that Mr. Swayze did not act with the other commissioners in making the selection, although he subsequently appended a certificate that he had examined the list and approved of it. He appears to have been absent from the state when the selection was made. This circumstance is an additional reason, if any were needed, for disregarding his published article as evidence for any purpose in the case.

It seems to us that the challenge has not a shred of evidence to support it; and so far as appears from the characters of the persons composing the grand and petit juries of the present term, the selection has been eminently judicious and proper. The challenge is not sustained.

At the March term, 1873, of the United States circuit court for the Northern district of Georgia, several of the same questions decided in the foregoing cases were argued before ERSKINE, District Judge, in the case of U. S. v. Gardner upon a challenge to the array of petit jurors.

B. H. Hill, L. J. Gartrell, and C. Peeples, made arguments in support of the challenge.

H. P. Farrow, U. S. Atty., George S. Thomas, Asst. U. S. Atty., A. T. Akerman, and A. W. Stone, contra.

ERSKINE, District Judge. Before the perusal of the panel, comprising six white persons and six colored, defendant challenged the array on the ground that the jury was illegally constituted, and moved that the array be quashed: "First. Because the United States jurors are required to be selected by the United States statutes, according to the laws of each state where said United States courts are held. Second. Because there is no authority of law for the United States court to appoint commissioners to select jurors. Third. Because the rules of court under which said jury was selected and impaneled limits the number of jurors to five hundred. Fourth. Because the manner of selecting jurors heretofore practiced by the United States courts in this state has not been repealed by competent authority. Fifth. Because the rule of court, under which the said panel of jurors was drawn, selected, summoned and impaneled, is without sanction of law, and contrary to the statutes of the United States in such case made and provided. Sixth. Because said panel of jurors was not drawn, selected and summoned according to law." Other objections—corollaries from the foregoing—were advanced during the arguments. These authorities were cited and relied upon by counsel for challenger: Code, §§ 3842, 3858, 3859; article 5, § 13, State Const.; Act Feb. 15, 1869; Judiciary Act, § 29 (1 Stat. 88); Act July 20, 1840 (5 Stat. 394); U. S. v. Woodruff [Case No. 16,758]; Same v. Wilson [Id. 16,737]; Clinton v. Englebrecht, 13 Wall. [80 U. S.] 434; Act June 1, 1872 (17 Stat. 196). The second paragraph of section 13, art. 5, of the state constitution of 1868 says: "The general assembly shall provide by law for the selection of upright and intelligent persons to serve as jurors. There shall be no distinction between the classes of persons who compose grand and petit juries." The third sentence refers to the compensation of jurors.

On the 15th of February, 1869, the general assembly passed an act to carry this clause into effect. [Laws Ga. (1869) p. 139.] This act contains eighteen sections—I will give the substance of so much of it as is applicable to the subject now before the court. It makes it the duty of the ordinary of each county, together with the clerk of the superior court, and three commissioners appoint-

ed for county by the judge of the superior court, to meet at the court house on the first Monday in June, biennially, to select from the book of the receiver of tax returns "upright and intelligent persons" to serve as jurors, and to make out tickets, with the names of persons so selected, and place them in a box, which shall be locked and sealed by the judge. And no grand or petit jury shall be drawn but in the presence of the judge in open court. But (by section 3) if the judge should fail to draw juries, then the ordinary, together with commissioners and clerk of said county, shall meet at the court house, within a certain time, and there draw grand and petit juries, all of which shall be entered by the clerk on the minutes of the court and signed by the ordinary. On reading the act just referred to, and which is entitled "An act to carry into effect the second clause of the 13th section of the 5th article of the constitution," it will disclose the fact that although it provides that the persons selected to serve as jurors shall be "upright and intelligent" (using the words of the constitution); yet it does not speak of the second sentence which declares: "There shall be no distinction between classes of persons who compose the grand and petit juries." Was this a casus omissus? Looking to the title of the act, there would appear to be some possible ground for this. But does not this very sentence carry itself into effect without legislative aid? Is it not per se operative and to be obeyed; and was not this probably the opinion of the legislature? My mind has always been impressed, with reasons too cogent to be discarded, that, notwithstanding the omission, it was the purpose of the legislature, by this enactment, to carry the entire clause into effect, and not to give force to a part only. During the first term of this court, after its organization, in framing the jury rule (to be considered presently), the substance of the second sentence was incorporated into it. If this setence is dormant, and requires legislation to bring it into action, then I may inquire, was the embodying of the substance of the sentence in the rules of court, going beyond the pale of the act of February 15, 1869—giving to it a too elastic construction?

By a rule of the United States district court (having circuit court jurisdiction) for this district, adopted at the March term. 1871, the marshal was instructed to procure from the superior court clerk for each county, comprising this district, a certain number of names of the "most upright and intelligent persons," between the ages of twenty-one and sixty years, to be taken from the jury lists of the county, without regard to race or color. Comment was made by counsel on both sides, during argument on the insertion of the word "most" before and in connection with, "upright and intelligent." in the rule of the district court. Whether the word "most" was in the draft of the rule

which I wrote, I do not now remember; if so, it was unadvisedly there. But what impediment would it have been to justice? Can either side complain? Was not the word, by fair intendment, to be applied to each class, white and colored? At most the word but expressed moral fitness as necessary to the end proposed. But to return; nearly seventeen hundred names were forwarded to the marshal (before the abrogation of this rule) by these clerks who responded to his request, and for which the government paid them. While this rule was of force. more than two hundred and fifty names were drawn from the jury box by the court, or its officers; but strange as it may appear, every ballot drawn from the box contained the name of a white person. Now, as the ratio of the classes in this judicial district has been for years past, as eight white to five colored, or nearly so, it is obvious to the common mind that this mode of designating or selecting the jurors cast the entire burden of jury service in the federal court upon one of the classes only—white citizens; thus releasing colored citizens, who possessed the qualifications for jurors, from the performance of a duty which they, equally with the qualified white citizens, owed to their country. Not only the constitution of this state, but the recent amendments to the national constitution have made the colored man a citizen; habilitating him with all the rights, privileges and immunities enjoyed by the white citizen; therefore, he should perform his part of the public labor. On the first of June, 1872, congress passed an act taking away the circuit court powers from the district court for this district, and establishing a separate circuit court. At the first term a rule of court was adopted, and it was under this rule that the persons now in the traverse jury box were designated, summoned and impaneled. But, before passing to this rule, it may not be wholly amiss to mention that it is a copy—mutatis mutandis—of the rule which met the sanction of, and was adopted by the United States circuit court for the Southern district of this state, at the last November term. The court was composed of WOODS, Circuit Judge, and ERSKINE, District Judge.

Attention will be directed to the act of July 20, 1840 (5 Stat. 394): (1) "Jurors," says the act, "to serve in the courts of the United States. in each state respectively, shall have the like qualifications, and be entitled to the like exemptions, as jurors of the highest court of law of such state now have and are entitled to. and shall hereafter, from time to time, have and be entitled to, (2) and shall be designated by ballot, lot or otherwise. according to the mode of forming juries now practiced and hereafter to be practiced therein; in so far as such mode may be practicable by the courts of the United States or the officers thereof; (3) and for this purpose the said courts shall have power to make all nec-

essary rules and regulations for conforming the designation and impaneling of juries in substance, to the laws and usages now in force in such state: (4) and further, shall have power, by rule or order, from time to time. to conform the same to any change in these respects which may be hereafter adopted by the legislatures of the respective states for the state courts." For convenience in the endeavor to interpret and construe this act, the clauses have been marked 1, 2, 3, 4. 1st. The qualifications of jurors, as mental capability, residence, age, etc. The second section of the first article of the constitution says: "All persons born in the United States and residents of this state are hereby declared to be citizens of this state." The requisite qualifications for persons to serve as jurors in the highest courts of law of this state, as declared by its constitution and laws, are that they be "upright and intelligent persons;" that they have resided in the county for six months immediately before they are called upon to serve as grand and petit jurors; that they are above the age of twenty-one years and under the age of sixty years. Code, §§ 3841, 3858. No property qualification is required in this state for a juror, and if it is not a mere rule of convenience for ordinaries, clerks and commissioners to select jurors from the book of the receiver of tax returns, and it be a necessary qualification that the juror must be a tax payer, then that qualification is included in the qualification of age. Acts March 18, 1869, and January 19, 1872. To be "white" was another qualification for a juror, but this no longer exists. The language employed by congress in this clause of the act of 1840 is direct and positive; it is also mandatory to the federal courts—that jurors, to serve therein, shall have like qualifications and be entitled to like exemptions as those of the highest courts of law in the state where the national court is held. Under this clause no discretion is given to the court. Clauses 2, 3 and 4 may be considered together. They provide for the designating or selecting of jurors by ballot, lot or otherwise, according to the mode of forming juries as practiced in the state wherein the federal court is being held, so far as such mode may be practicable by said court, or its officers, giving the power to said courts to make all necessary rules and regulations for conforming and adapting the designation and impaneling of jurors, in substance, to the laws and usages in force in the state at the time. Now, it was contended by counsel for the challenger that, for the designating or selecting of qualified persons to serve as jurors in this court, state authority—for example, a board comprising the ordinary of the county, the superior court clerk, and also three commissioners appointed by the judge of the superior court, is the proper agency to act in the premises: that it, and not the national court or its officers, is the agent to designate each particular juror to serve in this court, from the list on the books of the receiver of tax returns. The employment of state agency to designate or select jurors for the United States courts was not, in my opinion, contemplated by congress in making this law. The language of the act is, that the jurors "shall be designated by ballot, lot or otherwise, according to the mode of forming juries now practiced and hereafter to be practiced therein, in so far as such mode may be practicable by the courts of the United States or the officers thereof." Is it not the plain meaning of this, that the designation or selection is to be made by the national and not the state officers? But the argument of counsel, in its tenor, indicated that, at least, if the officers of this court are to designate or select its jurors, the names should be taken from the list of tax payers in each county in the district found on the tax receiver's books. If jurors, as the rule requires, are to be taken from the district at large, this would be virtually impracticable. And even if it were practicable to thus select them, I do not think the statute requires it to be done. The legal object is to select persons who possess the qualifications; it is not the mode in which this is to be accomplished that is imperative upon the court. In this matter a large discretion has been bestowed upon it by the statute itself.

Objection to the rule was urged for the challenger, "because the rule of court under which the jury was selected and impaneled limits the number of jurors in this district to five hundred." I have looked into this question, and I find nothing in any of the laws of congress as to what number shall be designated or selected. The acts of 1789 and 1840 apply only to the mode of selecting jurors and not to the number.

Counsel relied on the 5th section of the act of congress of June 1, 1872 (17 Stat. 196). This section declares (in substance) that the United States courts shall conform, as near as may be, to the practice, pleadings and modes and forms of proceeding in other than equity and admiralty causes as they may exist in like causes in the courts of record in the state at the time of holding the United States court therein. The act has no reference to the designating or selecting of jurors; nor, in my opinion, has it any application to the practice, pleadings or mode of proceeding in criminal cases as practiced in the state courts.

The case of U. S. v. Wilson [supra], was read and earnestly discussed. Two questions were before the court for decision in that case. The first was the construction of the act of July 20, 1840. Speaking of the first clause of the act, Wilson, J., said: "So far as relates to the qualifications and exemptions of federal jurors, the courts have no discretion." And the learned judge also said: "The courts from necessity were to exercise a discretion as to the practicability of desig-

nating and impaneling jurors according to the mode prescribed for selecting juries of the highest court of law in the state. They have the power and the discretion to change the mode from time to time. The court may exercise the power, or refrain to exercise it, as it may now deem practicable." The other question for decision was, whether where a grand jury, consisting of fifteen members, fourteen of them—the fifteenth being absent—return a true bill into court, the indictment was well found. The court held it was. · But it further held, that if a grand jury has even one disqualified person on the panel, the whole jury is tainted, and an indictment found by such a body would be void. And this has been the doctrine as to grand juries in England for the past four hundred years, and it prevails in this country. Doyle v. State, 17 Ohio. 222.

Counsel also relied on Clinton v. Englebrecht, 13 Wall. [80 U. S.] 434. This case arose exclusively under a law of the territory of Utah. The court there, proceeding on the theory that it was a court of the United States, issued an open venire to the marshal, acting apparently on the hypothesis that it was to be governed in the selection of jurors, by the acts of congress. Chief Justice Chase, in delivering the opinion of the court, held that the territorial court erred both in its theory and in its action; and that the making up of the lists and all matters connected with the designation of the juries were subject to the territorial laws.

Reliance was likewise placed by counsel for the challenger in the case of U. S. v. Woodruff [Case No. 16,758]. The defendant objected to a trial, on the ground that the jurors had not been selected conformably to the act of congress of July 20, 1840. The court. Mr. Justice McLean. in delivering the judgment. said: "By an early rule of this court, the clerk is required to issue a venire facias, commanding the marshal to summon twenty-four persons to serve as traverse jurors. * * * By the act of Illinois of the 3d of March. 1845, for the selection of jurors, it is made the duty of the county commissioners to select jurors. Now this court cannot call upon the officers of the state to do this duty, but we are bound to conform, as nearly as may be. to the state practice. The venire under the above rules leaves the selection of the juries to the marshal as his convenience shall permit. This does not, therefore. conform to the state practice. The jurisdiction of this court extends throughout the state, consequently the jurors should be selected from the state at large, and their names should be inserted in the venire. The court will therefore adopt a rule requiring the clerk and marshal to select the jurors from the state at large, previous to each term, and to conform in doing so. as near to the state practice as may be practicable."

The case of U. S. v. Wilson, instead of showing that the rule is not in conformity. to the laws of congress, is to my mind, an authority which sustains its legality. The case of U. S. v. Woodruff is so directly applicable. so fully covers the whole question, and so clearly supports the rule that no other authority need be adverted to, or invoked.

The motion to quash the array is overruled.